THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* TRINIDAD ARROYO PÉREZ, k/a TRINO PÉREZ, Defendant and Appellant.

No. CR-66-262.      Decided September 21, 1967.

*Santos P. Amadeo* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Peter Ortiz, Assistant Solicitor General,* for The People.

### JUDGMENT

The judgment of the Superior Court of Puerto Rico, Bayamón Part, of June 18, 1962, in criminal case No. M61-809 is reversed and defendant acquitted.

It was so decreed and ordered by the Court as witnesses the signature of the Chief Justice, who, like Mr. Justice Santana Becerra, did not participate herein. Mr. Justice Belaval rendered a separate opinion, in which Mr. Justice Hernández Matos concurs. Mr. Justice Ramírez Bages dissented.

(s) LUIS NEGRÓN FERNÁNDEZ

*Chief Justice*

I attest:

(s) JOAQUÍN BERRÍOS
Clerk

—O—

Separate opinion of MR. JUSTICE BELAVAL, with whom
MR. JUSTICE HERNÁNDEZ MATOS concurs.

San Juan, Puerto Rico, September 21, 1967

The present appeal merely assigns as sole error the fol-
lowing: "Pursuant to the provisions of §. 3 [read 4] of
said Act No. 220, it is required that a person caught vio-
lating the bolita. act. shall be immediately arrested. He shall
be brought before a district attorney, nowadays before a mag-
istrate, who shall file the information in view of the evidence
obtained. This mandate of the law is inconsistent with the
system of undercover agents which, without the authoriza-
tion of the law, has been established in Puerto Rico to investi-
gate and enforce the bolita act. This situation places the
defendant at a disadvantage since the outcome of the trial
depends on whether the judge believes the defendant or the
undercover agent. And, furthermore, since the arrest was
not made immediately but about three months subsequent
to the alleged commission of the offense, this fact puts de-
fendant. at a disadvantage since it precludes him from pre-
senting the defense of alibi, which he cannot do because he
cannot remember where he was on the day the undercover
agent alleges he sold him bolita. Therefore, the problem
raised herein is not one for a speedy trial, but one for an
impartial trial under the due process of law."

The first ground does not convince us. The state has
available three systems for the persecution of an offense:
(1) the immediate arrest when the criminal act occurs in the
presence of a peace officer; (2) the subsequent search when
any act makes the officer suspicious that an offense is being
committed; (3) the raid, a more extensive persecution for
the purpose of capturing an entire organization of delin-
quents. Naturally § 4 of Act No. 220 of 1948 refers to the

first modality of persecution, that is, the immediate arrest when the criminal act occurs in the presence of a peace officer. Contrary to what is expected, the speedy trial provided by § 4 of Act No. 220 of 1948, as amended, does not contemplate the greatest protection for defendant, which would be a contradiction in an offense declared a public nuisance, but to create a "rigor" in the persecution of defendant within the characteristic tension of public "punishment."

When it is necessary to obtain objective evidence to establish the criminal seizure of a suspect, the search warrant is always the proper thing. It is also an effective method when it is necessary to stop the operation of a delinquent group, through the destruction of the criminal materials. Furthermore, it does not conflict with the immediate individual arrest.

The problem created by the raid is that it is a method of persecution that, not having been designed for the immediate arrest of suspects or the destruction of the criminal materials, but for the persecution of a certain type of political crime, it does not operate harmoniously when applied to the ordinary prosecution. As it is well known the raid is used to confront the "Crimes Against the Country"— treason, espionage, sabotage, sale of secret documents—or the offenses against the security of the State, such as the smuggling of weapons or drugs. See: Juan B. Carballa, "*Delitos contra la Patria*," 1951 edition of the *Biblioteca de Publicaciones Oficiales de la Facultad de Derecho y Ciencias Sociales de la Universidad de Montevideo.* In the raid, defendant's opportunity for defense, the undercover agent's acts of instigation, the imponderable social risk, must all be carefully scrutinized, viewed with tranquil eyes, until the purple rose of justice opens in our conscience.

But we do agree with defendant in that when the prosecution of a defendant is limited to two simple testimonies,

one, that of the undercover agent with a bare annotation of the facts sufficient to constitute an offense, but without any clue to help us discover the truth, which is the essence of justice; the other, that of defendant, with the criminal act rather in a maze in his mind because of the lapse of time, who has to resign himself to a mere denial of the facts alleged by the undercover agent, the dilemma arises of whether to believe the testimony of a peace officer or that of defendant, there possibly being a tendency to believe the undercover agent rather than the disturber of peace, thereby causing a situation contrary to every order of law, of deciding against defendant any doubtful point contained in the evidence.

Fortunately, in this case the dilemma is not so close. The only witness of the incriminatory evidence is Roberto Flecha Delgado, the undercover agent, who testifies that about September 16, 1961, he was working for the Vice Control Squad of the Police Force of Puerto Rico, stationed in the town of Dorado; that that day, on arriving at ward San Antón in Dorado, he met defendant in a small refreshment stand beside his house; that the witness approached the stand to drink a beer and then he noticed that the man was jotting down bolita figures for the woman who was there; "three digit figures followed by a hyphen and other figures on the right-hand side in a list on white paper, school notebook paper, then I expressed my desire to bet. I told him to jot down for me No. 650 with 80 cents, which he jotted down under the other figures he had already jotted down and he jotted down 650, dash and 80 cents to the right and then we talked for awhile and he told me that he was going to obtain some bolipool notebooks for me to sell, to work as his fixer, and we agreed to that, and three or four days later I went again to his house to see whether he had obtained the notebooks for me and he told me that he had quit that business"; he did not deliver receipt of the

numbers to him; "I did not arrest him because I was making a confidential investigation and if I arrested him my identity as undercover agent would be revealed"; that the stand "is a small business owned by his neighbor; it is a small business where beer and different tidbits and refreshments were sold," that "the person who was there attending the business" was "a middle-aged woman who is his neighbor"; that at the time of the transaction "she was behind the counter and we were in front buying"; he knows that the man (defendant-appellant) lives nearby, a little farther on, in a concrete house with a small porch; that he saw defendant "three times, the day before the transaction, the day of the transaction, and three or four days later when I went to his house."

On cross-examination by defendant's attorney; to the question: Who is the woman you (the agent) say bought numbers? He answers: The woman, I cannot remember her name; to the question: How is that woman?, he answers: she is sort of dark, about 50 years old; to the question: Was that woman working at the stand? He answers: Yes, sir; it belonged to her. Cross-examined in relation to his mission, he answered: "it was to go to that area of the town of Dorado, work as undercover agent, gather evidence in relation to the violation of the law and then file the report"; that he saw defendant three times, but he saw him handle bolita material only once. This is all the incriminatory evidence.

Defendant testified that he was 62 years old, that he worked in the construction business, "I have been working there in Garden Hills for about seven years . . . formerly I worked in Hotel Dorado," he has worked in construction for over twenty years; "well, I have never seen that man" (he refers to the undercover agent who testified). "I saw him that day when I was sleeping at my house, at noon, and then the woman who was in the business, you see, sent for me . . . a woman whom he accused of having committed

a violation of the bolita act, then I went there and saw that man, I saw him there, and then he said to me: 'Hello, Trinidad, how are you, don't you remember me?'; no, sir, I do not know you, I do not know who you are; 'that you do not know me, you do not remember when I was working in the hotel?' I told him: 'I do not know you', then, he says: 'Look, this is my problem . . . I was in the United States and I was engaged in the bolita business, I was engaged in that, and that is profitable business, that is something worthwhile' then he says: 'I want you to bet on a number,' I said to him: 'that I bet on a number, I do not even know what bolita is, I do not want to know about bolita'; 'Come on, come on, can't you get me 25 or 30 notebooks to sell?', that I get notebooks for him, 'you think I am a banker', no, he said to me, 'look the thing is that I am in that business.' He left and that was all. He came back next day asking whether I got that for him, whether I got the notebooks or asked me to receive a list he was bringing, he was bringing me a collection from a list of numbers." That was all; that he did not sell No. 650 with 80 cents, or has ever been a fixer.

Cross-examined by Mr. Grajales, prosecuting attorney of the Bayamón Part, he answered that he did not know the undercover agent, and notwithstanding that fact, said agent is the one who took the first steps "for me to sell to him or get him notebooks or to receive collections for him to bring to me"; that it was he, who "approached me" not the witness to the instigating agent, and he answered that "I neither sell nor gambled at that"; that the witness did not know that the person who offered to buy or sell bolita to him was a policeman; to the question: "why did he visit you next day looking for bolita notebooks?" he answers: "because he asked me whether I could get him 25 or 30 notebooks, that he was a fixer"; that he said that the first day he saw him, and that at that time nobody was with him and de-

fendant did not answer him; that the undercover agent asked defendant "to get 25 or 30 notebooks for him, and defendant answered: 'do you think I am a fixer or a banker?, . . . that was all,'" and notwithstanding, the next day he came to defendant's house to get the notebooks, although defendant told him he was not a banker or a fixer.

As it will be remembered the undercover agent, explaining the times he had seen defendant, testified: "three times, the day before the transaction, the day of the transaction, and three or four days later when I went again to his house"; that on the day of the transaction he had seen defendant "roaming around"; a moment before he had testified that "about three or four days later I went again to his house to see if he had the notebooks for me, and he told me that he had quit the business, it seems he suspected or something of me." Defendant, now under examination, testifies that the next day the undercover agent again asked him to get the notebooks for him, that he answered the same, that he was neither a banker nor a fixer; that the agent "left at that very moment and then he returned in the afternoon and asked that if I did not get the notebooks for him whether I could receive a list that he was bringing me a collection of $40 or $50 and he wanted me to receive it"; that defendant answered: "Look, sir, I am sick of you, who do you think I am? I am a hardworking man, I have a big family, if I have to roast a pig I do it, if I have to make a repair in a building, I do it. That is all that happened"; that he has sixteen children and that he can say "under oath and before God" that he never sold a bolita number to the undercover agent, and that he has never been engaged in the bolita game.

The second witness for the defense is Ramón Ruiz Sánchez, who has known defendant for about seven or eight years and that he has been engaged in the construction business, "a very serious man, very devoted to his family.

He has 16 children and besides that he has taken in two or three of his neighbor's children, whose mothers have died, and he has undertaken to bring them up, and he works hard in the construction of houses to provide for that family"; that as far as he knows defendant does not have the reputation of a fixer.

In strict order of evidence what this case presents is the mere testimony of an agent who says that defendant jotted down a number for him, without it appearing from the evidence that he paid for said number, and immediately an evident intent of instigation to get defendant to prepare for him 25 or 30 school notebooks of those used to sell bolita, and realizing that he could not get the notebooks from defendant he instigates him to receive a list for which there was a collection of $40 or $50 already gambled. Defendant refuses to do all that, as it appears from the evidence for the prosecution. The explanation offered by the agent for said refusal is that perhaps defendant suspected that he was an undercover agent; the explanation offered by defendant is that he refused to do it because he is neither a banker nor a fixer. In the presence of this set of circumstances it is natural that we hesitate. And in case of doubt:

The judgment rendered by the Superior Court of Puerto Rico, Bayamón Part, on June 18, 1962, in criminal case No. M-61-809 should be reversed.